THE HONORABLE BENJAMIN H. SETTLE

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| SARAH OLSON f/k/a/ Sarah Grinenko,<br><br>Plaintiff,<br><br>v.<br><br>OLYMPIC PANEL PRODUCTS, LLC, a Washington State Limited Liability Company, et al.<br><br>Defendants | NO. C07-5402<br><br>DECLARATION OF LEWIS L. ELLSWORTH IN SUPPORT OF OLYMPIC PANEL PRODUCTS' MOTION FOR PARTIAL SUMMARY JUDGMENT DISMISSING SELECTED CLAIMS<br><br>NOTED FOR: NOVEMBER 21, 2008 |

I, LEWIS L. ELLSWORTH, declare as follows:

1. I am the Attorney of Record for Defendant Olympic Panel Products, LLC ("Olympic" or "OPP"). I make this declaration based on my own personal knowledge.

2. Attached hereto as Exhibit A are true and correct copies of transcript excerpts taken from the deposition of Sarah Olson on October 16, 2008.

3. Attached hereto as Exhibit B are true and correct copies of transcript excerpts taken from the continuing deposition of Randy Ward on July 25, 2008.

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA, PETERSON & DAHEIM LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON 98401-1157
(253) 620-6500 - FACSIMILE (253) 620-6565

I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT.

Signed this 28th day of October, 2008, in Tacoma, Washington.

LEWIS L. ELLSWORTH

ELLSWORTH DECL IN SUPP OLYMPICS' MOTION FOR - 2 of 2
PARTIAL SUMMARY JUDGMENT ON SELECTED CLAIMS
(C07-5402 BHS)
[1427921 v1.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA, PETERSON & DAHEIM LLP
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON 98401-1157
(253) 620-6500 · FACSIMILE (253) 620-6565

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

SARAH OLSON f/k/a Sarah Grinenko, )
)
Plaintiff, )
)
vs. ) No. C07-5402 BHS
)
OLYMPIC PANEL PRODUCTS, et al., )
)
Defendants. )
)
)

DEPOSITION OF SARAH OLSON

October 16, 2008

Shelton, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square
600 University St.
Suite 2300
Seattle, WA 98101

2208 North 30th Street, Suite 202
Tacoma, WA 98403
(253) 627-6401
(253) 383-4884 Fax

(206) 340-1316

scheduling@byersanderson.com

(800) 649-2034

www.byersanderson.com

Serving Washington's Legal Community since 1980

EXHIBIT A

THE WITNESS: I did go see Dr. Hawkins.

**Q (By Mr. Ellsworth) Was Dr. Hawkins a doctor you saw for treatment, or a doctor that you saw with respect to this litigation?**

A It was supposed to be for both, but I could not afford him.

**Q Did Dr. Hawkins provide any treatment to you?**

A No, he did not.

**Q Do you have a current family doctor?**

A I do not have a current family doctor, no.

**Q I want to ask you some questions that are specific to your lawsuit.**

MR. BONIN: Objection to the form of the question.

**Q (By Mr. Ellsworth) You have alleged that Dwight Midles and Mel Matson disclosed confidential information about you to employees at OPP.**

**What did they disclose?**

A They disclosed -- Mel Matson disclosed to Toinette Wines about what had happened to me, and he's told her that she should talk to me. And then when I got back, he told me that he had told Toinette Wines, and that she would be a good person to talk to.

**Q Who did Dwight Midles make any disclosures to?**

A He made disclosures to Randy Ward.

**Q And how do you know that?**

A Randy Ward called me after I had my last day at Olympic Panel, and told me that he had never believed me about my story, he thought I was just trying to get time off of work.

**Q So you never had a discussion with Dwight Midles. What you know about Dwight Midles you heard from Randy Ward?**

MR. BONIN: Object to the form.

THE WITNESS: I never had a personal conversation with Dwight Midles.

**Q (By Mr. Ellsworth) Okay. And what did Randy Ward tell you that Dwight had said about your rape?**

A Randy Ward had told me that he never believed me on my story about the rape, and that I was just trying to get time off of work.

**Q And other than Toinette Wines, are you alleging that Mel Matson disclosed your rape to anybody else at OPP?**

A Toinette Wines is the only one he told me personally about.

**Q Okay. Is there anyone else that you believe he told it to?**

A I believe he told it to the whole plant.

**Q Okay. Can you give me any facts that would support that belief?**

A Everybody knew about it.

**Q When you had a leave of absence and you came back to work --**

MR. BONIN: Object to form.

**Q (By Mr. Ellsworth) -- did you talk with Mel Matson after you came back to work, after the leave of absence you requested?**

MR. BONIN: Object to the form.

THE WITNESS: I talked to Mel Matson. I gave him the police report that he and Dwight had requested, and I went back to work after he had told me about Toinette Wines.

**Q (By Mr. Ellsworth) Did he tell you why he had allegedly told Toinette Wines about your situation?**

MR. BONIN: Object to the form of the question. Asked and answered.

THE WITNESS: He had told me that she would be a good person to talk to.

**Q (By Mr. Ellsworth) Did you understand he was trying to be helpful to you?**

MR. BONIN: Object to the form of the question. Leading.

THE WITNESS: I believe he was telling personal information that he should have never told in the first place.

MR. ELLSWORTH: Of course it's leading, Counselor. She's the plaintiff in the case.

MR. BONIN: Counsel, in the last deposition, taken yesterday, I asked you if you wanted to do a standing objection to the issue of leading questions. And you said no, you must enter objections to every question that was asked.

MR. ELLSWORTH: She was a witness, Counsel. She wasn't a party.

MR. BONIN: I'm not going to have a debate with you. I'm going to enter my objections. I'm objecting to the form of your question.

**Q (By Mr. Ellsworth) So did you have a feeling that Mr. Matson told Ms. -- allegedly told Ms. Wines about your rape because he was attempting to be malicious?**

MR. BONIN: Objection to the form of the question.

THE WITNESS: I don't know what he was trying to do.

**Q (By Mr. Ellsworth) Did you have -- did he appear that he was trying to be solicitous and helpful to you?**

MR. BONIN: Objection to the form of the question.

THE WITNESS: I don't know.

**Q (By Mr. Ellsworth) So it's the fact that you think he**

**disclosed something to Ms. Wines that you're unhappy about?**
A Yes.
MR. BONIN: Objection to the form of the question.
Q **(By Mr. Ellsworth) Okay. But you have no -- you don't have any belief, one way or the other, whether he was doing it to assist you to come back in the workplace or for any other reason?**
MR. BONIN: Objection to the form.
THE WITNESS: I believe that Mel Matson should have asked my permission before he disclosed that information.
Q **(By Mr. Ellsworth) Okay. And tell me, in as much detail as you can recall, when you came back to work and you met with Mel Matson, describe that conversation for me.**
A When I went back to work, I had a conversation with him. It was very brief. I gave him the police report. He asked me if I was okay. I said yes. He told me that he had told Toinette Wines, and that she should be -- she would be a good person to go to and talk to, and then I was on my way.
Q **Okay. Did you tell him at that time, "You shouldn't have told Toinette Wines anything about this"?**
A I didn't say anything.

Q **Okay.**
A I was more in shock than anything else.
Q **And then did you go talk to Toinette Wines?**
A Not about the rape, no.
Q **Did you ever tell Toinette Wines that you had been subject to a rape?**
A No, I did not.
Q **Other than what you've just told me Mel Matson said, did he say anything else to you?**
MR. BONIN: Objection to the form.
THE WITNESS: Mel Matson didn't say anything at that time that I can remember.
Q **(By Mr. Ellsworth) So he just said Toinette Wines would be a good person to talk to. And what did he say --**
MR. BONIN: Objection to the form. Mischaracterizes of testimony.
Q **(By Mr. Ellsworth) Did he say, "I told Ms. Toinette Wines that you had been raped," or did he tell you that Toinette Wines was a good person to talk to? What did he say?**
A Mel Matson said that he had told Toinette Wines about my situation and that she would be a good person to talk to.
Q **About your situation.**
MR. BONIN: Objection to the form.
THE WITNESS: Not exact words. I

cannot remember to this day.
Q **(By Mr. Ellsworth) Did he say, "I told Toinette Wines you'd been raped"?**
A I -- like I just said, I cannot remember to this day what his exact words were.
Q **Okay. And did you ever ask Toinette Wines what Mel Matson said to her?**
A I never wanted to bring it up. It's a little embarrassing.
Q **Okay. So you don't know whether Mel Matson said anything about your rape to Toinette Wines?**
MR. BONIN: Objection to the form.
THE WITNESS: Toinette Wines knew about it. She did not tell me specifics of what he said. But we had lunch a couple times, and I could tell she knew because she just -- the way she acted, the way -- she asked me if I was okay, that she had been there before, it's happened to her before. She told me stories about her. Obviously she knew.
Q **(By Mr. Ellsworth) But the subject of your rape was never raised by either you or Toinette Wines?**
MR. BONIN: Objection to the form.
THE WITNESS: I did not tell her specifics of my situation, no.
MR. BONIN: Compound question.

Q **(By Mr. Ellsworth) Now, you sued Mr. Matson and Mr. Midles for the tort of intentional infliction of emotional distress.**
**What did Mr. Midles do that inflicted -- that you believe intentionally inflicted emotional distress on you?**
A Mr. Midles never wanted to hire me in the first place, and then the comments he made to Randy Ward were pretty distressing, as well.
Q **And what did Mr. Matson do that you allege intentionally inflicted emotional distress upon you?**
A Mr. Matson told Toinette Wines about my situation. I asked him for help with the situations I was going with on the floor, and he told me it didn't matter, and not to care.
Q **Did Mr. Matson ever say anything to you that you found sexually offensive?**
A He did not say anything to me, no. But Randy Ward, when he did the flashing gesture in front of Mel Matson and Larry Brown, they were laughing, and they had a conversation which I was later told about.
Q **Did Mr. Matson ever engage in any conduct towards you that you found to be sexually offensive?**
A No.
Q **Is your allegation against Mr. Matson simply that he**

**didn't follow up on the complaints that you were making?**

MR. BONIN: Objection to the form of the question.

THE WITNESS: That is not my only complaint, no.

Q **(By Mr. Ellsworth) Other than -- then what is your complaint? If it's not what he said to you or what he did to you, and not following up on your complaints, what else did Mr. Matson do?**

A My complaint about Mel Matson is that -- the conversation he had with Randy Ward. They never -- neither -- one of -- nobody in management ever followed up with me about my complaints. He told a lady that got -- helped me get the job that he never wanted to hire me in the first place.

Q **Now, this conversation with Randy Ward and the conversation --**

MR. BONIN: Counsel, you've interrupted Ms. -- Ms. Olson.

Did you have more that you wanted to say, Mrs. Olson?

Q **(By Mr. Ellsworth) Were you still answering?**

MR. BONIN: You're --

Q **(By Mr. Ellsworth) I didn't mean to cut you off. If you had an answer, please finish.**

A I don't remember what I was saying, so I guess I'm done.

Q **What was the conversation with Randy Ward and Mel Matson that you're referring to?**

A The conversation I'm referring to is the one when Randy Ward called me on my last day at OPP and told me that Randy -- or Mr. Midles and Dwight were -- Mel Matson and Dwight were very -- were happy that I was gone because he had never believed me and my story on the rape, I was just trying to get time off.

Q **So you heard about Mr. Matson from Randy Ward?**

A Yes, I did.

Q **Okay. And you never had a discussion with Mr. Matson -- well, strike that.**

**Conversation with another woman about your being hired --**

MR. BONIN: I'm sorry; did you strike a question, Counsel?

MR. ELLSWORTH: Yes.

MR. BONIN: Okay.

Q **(By Mr. Ellsworth) A conversation with another -- you referred to a conversation with another woman about your being hired.**

**What was that about?**

A Janine LeBay --

MR. BONIN: Objection to the form.

THE WITNESS: -- was the one that helped me get the job. And she had told me she had to go talk to Dwight to ask him to give me a chance because he did not want to hire me.

Q **(By Mr. Ellsworth) What's that got to do with Mel Matson?**

A With Mel Matson? Nothing.

Q **Okay. So have you told -- have I exhausted all of the issues that you have with Mel Matson?**

MR. BONIN: Objection to the form of the question.

THE WITNESS: No.

MR. BONIN: Vague.

Q **(By Mr. Ellsworth) Okay. What other issues did you have with Mel Matson?**

A I went to him three times, asking for his help. And he told me it didn't matter, not to care, don't worry about it. Tell them you had a boyfriend.

Q **So you were making complaints to Mr. Matson, and Mr. Matson wasn't following up on your complaints; is that --**

A Not at all.

Q **Okay. So that's the issue you have with Mr. Matson?**

MR. BONIN: Counsel, I'm going to ask that you please allow a reasonable opportunity, at least

some measure of a gap between questions because it is absolutely clear to me that you are cutting her off.

Q **(By Mr. Ellsworth) If I'm cutting you off, just tell me. It's not my intention.**

A I will.

Q **So the issue you had with Mr. Matson was, you were bringing concern to him of other employees, and he wasn't investigating them and was being dismissive of your complaints; is that the gist of what your problem with Mr. Matson was?**

A That is correct.

Q **Is the answer yes?**

A Yes.

Q **How many times did you meet with Mr. Matson to express your concerns?**

A I can remember meeting with him three times.

Q **Tell me about the first time.**

A The first time I met with him, I told him about some of the situations that were going on, and I told them to stop and they weren't stopping, and I needed him to talk to them, to tell them to leave me alone. And he told me that it didn't matter, don't worry about it, it's not a big deal.

Q **When, approximately --**

MR. BONIN: Again, Counsel --

Page 33

A I never told him he had a heart attack. I told him he was in the hospital because he had either high blood pressure or a heart problem.

**Q Did Dwight Midles ever say anything to you that you found sexually offensive?**

A No.

**Q Did he ever engage in any conduct towards you that you found sexually offensive?**

A He never did engage in any conduct, no.

MR. ELLSWORTH: Let's take a break for a minute.

(Recess from 10:30 a.m. to 10:37 a.m.)

EXAMINATION (Continuing)

BY MR. ELLSWORTH:

**Q When did you first apply for a job at the casino?**

A I believe I first applied June, early July.

**Q When were you told that you would be getting the job?**

A Well, I guess it was -- I applied in June because I first heard in July.

**Q Have you ever been over to Randy Ward's house for a meal?**

A After the Log Cabin, he did proceed to take me to his house, and I had my friend pick me up from his house.

**Q Did you voluntarily go to his house?**

A I didn't know we were going there, no.

Page 34

**Q Did you ask him to take you someplace else?**

A No, I did not.

**Q Did you share a locker at work with Randy Ward?**

A I did not share a locker.

**Q Did you ever keep your purse in his locker?**

A I think I might have once, but I never brought my purse in to work.

**Q Did you ever put any personal effects into Randy Ward's locker?**

A I never brought anything in to work.

**Q So you never put anything in his locker?**

MR. BONIN: Objection to the form of the question. Asked and answered.

THE WITNESS: I stated before that I might have put my purse in there once, but I never brought personal things in to work.

**Q (By Mr. Ellsworth) To put something in his locker even once, would you have had to ask him to do that?**

A Yes, I would have.

**Q Weren't there other people who you could have asked to put something in their locker?**

A There was plenty of people that I could have put their locker in, but I never brought anything in to work.

**Q But you put your purse into Randy Ward's locker once?**

A I said I might have once.

Page 35

**Q Did you call Randy Ward after you quit OPP?**

A No, I did not. He called me.

**Q Did you ever ask Frank Dilbert to ask Sean Scupine to ask you out on a date?**

A No, I did not.

**Q Did you ever call Toinette Wines on your phone?**

A I think I called her to make sure she was still coming to the casino. We had lunch once there.

**Q How would you describe your relationship with her?**

A Toinette was a girl I worked with. I thought she was nice. We had lunch twice.

**Q Did you have lunch with any other women at OPP?**

A I had lunch with Rhonda Williams one time when she was training me.

**Q Did you have any reason to believe that Toinette Wines would be hostile to you in any way?**

MR. BONIN: Object to the form.

THE WITNESS: Not at the time.

**Q (By Mr. Ellsworth) Do you have any reason to believe that Toinette Wines wouldn't tell the truth --**

MR. BONIN: Objection to the form of the question.

**Q (By Mr. Ellsworth) -- about what she knows about this case?**

A I don't know Toinette Wines well enough to know.

Page 36

**Q Did you ever bring a breakfast sandwich to Rick Brookhauser at work?**

A I brought breakfast sandwiches in for myself.

**Q Did you bring them for Rick Brookhauser?**

A Not that I can remember.

**Q Did you ever bring one in for Randy Ward?**

A I might have. Not that I can remember. I worked at Jack in the Box. I brought sandwiches in every morning.

**Q Did you and Randy Ward and Rick Brookhauser ever go look at a truck together that you were thinking of buying after you'd wrecked your car?**

MR. BONIN: Object to the form.

THE WITNESS: No.

MR. ELLSWORTH: I believe that's all the questions I have.

MR. BONIN: According to the Court's scheduling order, the conduct of depositions in multi-defendant litigation, one counsel is supposed to ask all questions. I've entered an objection previously. I'm entering it now.

MR. HANBEY: It's been noted for the record.

MR. ELLSWORTH: I have no obligation to ask questions to defend Mr. Hanbey's clients.

MR. BONIN: I'm not here to engage in

STATE OF WASHINGTON )
) ss
County of Pierce )

I, Cindy M. Koch, CCR, RPR, CRR, CLR, CCR # 2357, a duly authorized Notary Public in and for the State of Washington, residing at University Place, do hereby certify:

That the foregoing deposition of SARAH OLSON was taken before me and completed on October 16, 2008, and thereafter was transcribed under my direction; that the deposition is a full, true and complete transcript of the testimony of said witness, including all questions, answers, objections, motions and exceptions;

That the witness, before examination, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth, and that the witness reserved the right of signature;

That I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel and that I am not financially interested in the said action or the outcome thereof;

That I am herewith securely sealing the said deposition and promptly delivering the same to Attorney Lewis Lynn Ellsworth.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this day of , 2008.

Cindy M. Koch, CCR, RPR, CRR, CLR,
Notary Public in and for the State of Washington, residing at University Place.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

SARAH OLSON f/k/a Sarah Grinenko,

Plaintiff,

vs. No. C-07-5402

OLYMPIC PANEL PRODUCTS, LLC a Washington State Limited Liability Company, Dwight Midles and "Jane Doe" Midles, individually and in the marital community composed thereof, Mel Matson and "Jane Doe" Matson, individually and in the marital community composed thereof, Sean Scupine and "Jane Doe" Scupine, individually and in the marital community composed thereof, Shane Scupine and "Jane Doe" Scupine, individually and in the marital community composed thereof, Brandon "Bling" Thompson and "Jane Doe" Thompson individually and in the marital community composed thereof, Raymond Doyle and "Jane Doe" Doyle individually and in the marital community composed thereof, Robert "Bob" Pierson and "Jane Doe" Pierson, individually and in the marital

community composed thereof, Eric Dobson and "Jane Doe" Dobson, individually and in the marital community composed thereof, and The International Association of Machinists, Woodworkers Local Lodge W-38,

Defendants.

CONTINUING DEPOSITION OF RANDY WARD

Deposition taken at: 1800 Olympic Hwy South
Shelton, WA 98584

Deposition Taken: July 25, 2008 1:00 PM
Reported by Karle A. Taylor, License #3081

APPEARANCES

For the Plaintiff: Mr. John R. Bonin
Bonin & Cook, PS
Attorneys at Law
1800 Olympic Hwy S., Ste 1,2,3
Shelton, WA 98584

For the Defendants: Mr. Rick Cordes
Cordes, Brandt, PLLC
Attorneys at Law
2625 B. Parkmont Lane SW
Olympia, WA 98502

Ms. Elizabeth P. Martin
Gordon, Thomas, Honeywell, Malanca, Peterson & Daheim
Attorneys at Law
1201 Pacific Ave, Ste. 2100
Tacoma, WA 98401

INDEX

EXAMINATION BY MR. BONIN: ------------------ 5 - 189

EXAMINATION BY MR. CORDES: ----------- No Examination

EXAMINATION BY MS. MARTIN: ----------- No Examination

REPORTER'S CERTIFICATE: --------------------- 192

EXHIBITS

| Exhibit # | Description |
|---|---|
| 1 | OPP Forms |
| 2 | OPP Form |
| 3 | Supervisor Action Form |
| 4 | OPP Forms |
| 5 | Handwritten letter |

Page 161

**Q. Is it scheduled?**
A. Yes.
**Q. Is it a listed schedule; you are on spreader number?**
A. For the most part.
**Q. The spreader you are talking about, I don't want to walk by that spreader, what spreader number was it?**
A. Five.
**Q. And you were on spreader number?**
A. Four. Maybe three. There might have been one in between us, but it would have been empty.
**Q. During this 15 minute conversation you didn't discuss with her why she was leaving?**
A. Yeah, I tried to. I think I told her I was glad for her. I was happy that she was getting out of there because it seemed like things weren't working out real well for her there. She seemed to have a lot more complaints about working there in general. Nothing in the sexual form. Just individuals -- just people, and it seemed like it was a go no where deal for her.
**Q. What complaints are you talking about?**
A. Well, I'm just saying -- let me rephrase that and say, she just didn't seem real happy.
**Q. What causes you to believe that? What did she say to you?**
A. I am no shrink. I don't know. She just didn't seem

Page 162

real happy with the Scupines and stuff she said was going on.
**Q. What stuff with the Scupines?**
A. We already talked about this. You're wasting me and my lawyer's time here. We have already talked about this. There was that rumor that she said that she heard about the Scupines having a contest on who would date her, and you know --
**Q. What else?**
A. Just some of that stuff we talked about this unwanted advice from Bob Pierson.
**Q. You use the word complaints plural. Are those the only complaints you talked to her about?**
A. Well, she just didn't seem real happy there. She talked about going back to school at Centralia College, and to me that seemed like that would be a better deal for her, truth.
**Q. Do know who is dating who at work?**
A. No, not really.
**Q. Do you know Karissa Compten?**
A. I do. I know who she is.
**Q. Do you know who she was dating for a while?**
MS. MARTIN: Objection. Form.
A. I have no idea.
**Q. Do you know whether or not she ever dated one of the**

Page 163

**Scupine brothers?**
A. No.
**Q. Go out and socialize with them; do you know anything about that?**
A. No.
**Q. Do you know who Kecia Johnson is?**
A. No.
**Q. Do you know who Christine Hoyt is?**
A. No.
**Q. Do you know who Sunshine Spurgeon is?**
A. No, they were all gone before I got there.
**Q. When you go to work is there a bulletin board in break rooms where things are posted?**
A. There is a bulletin board down below where jobs and such are posted and thank you letters and overtime notes and stuff like that.
**Q. Is there anything posted about this litigation?**
MS. MARTIN: Objection. Form.
A. Not that I know of. I haven't seen it.
**Q. Is there anything posted about this litigation?**
A. No, I haven't seen that.
**Q. Have you ever seen it posted anywhere in the plant?**
A. No.
**Q. You had many telephone conversations with Sarah Grinenko as I understand from you testimony?**

Page 164

A. Well, I would say several.
**Q. Do you deny telling Sarah Grinenko that Mr. Matson talked to you about his being glad --**
A. Absolutely.
**Q. Let me finish the question.**
A. Sorry, sir.
**Q. -- his being glad that Sarah Grinenko was gone; do you deny making a personal phone call to her saying that?**
A. Absolutely.
**Q. Do you deny having told Sarah Grinenko that Mr. Matson reported to you that Mr. Midles said that he was glad that she was gone?**
A. Absolutely.
**Q. Do you deny that Mr. Matson reported to you that Mr. Midles had said that he never believed the story about the rape anyway?**
A. Absolutely.
**Q. Did you and Mr. Matson ever have a conversation about the rape?**
A. No.
**Q. Did you and Mr. Midles ever have a conversation about the rape?**
A. No. Well, maybe when this whole thing arose, I think. I don't call it a conversation. It was pretty one way.

Page 165

**Q. One way, what do you mean?**
A. Well, he was asking the questions, and I was answering them, as I recall, and I could be dead wrong about that but this was -- just seemed -- maybe not. I don't know. I don't recall, but I don't recall talking to anybody about that ever at that mill. It seemed like that and I may have brought that up. I don't know for sure.
**Q. Were you on the same shift with Ms. Grinenko when there was discussions about her 21st birthday?**
A. I do recall our birthdays are only a couple of days apart.
**Q. When did you learn that?**
A. I just remember her saying her birthday was like August 2nd.
**Q. And your birthday is?**
A. 7th.
**Q. Do you remember when that conversation in the course of all this happened?**
A. No, sir.
**Q. You haven't talked to her about this litigation, have you?**
A. I just about did last Saturday night, but no, I haven't. I just bumped into Sarah at the casino, my wife and I.

Page 166

**Q. That's right you and another person at OPP spend a lot of time at that casino, don't you?**
MS. MARTIN: Objection to form.
A. God no. No. Hell no. Totally wrong.
**Q. But you know she works there?**
A. I do now. Actually somebody said they saw her there, too.
**Q. Who?**
A. I don't recall.
**Q. Did you see her there while she was pregnant?**
A. No, but I heard she was pregnant and had a baby.
**Q. You are denying that Ms. Grinenko told you that you needed to stop it?**
A. Absolutely.
**Q. How many other people out there share lockers?**
A. I have no idea.
**Q. More than one? More than one other?**
A. I think so.
**Q. Are there a limited number of lockers?**
A. Yes.
**Q. Less lockers than employees?**
A. Yes, I think. They had a big push here not too long ago where they wanted your name on the locker.
**Q. Did she ask you or did you offer?**
A. No, she asked me if she could keep her purse and

Page 167

personal things in the locker because she had nowhere to put them once they moved her to the spreaders. Actually there is still some of her things in my locker.
**Q. At any time did you ever hear the following words, you won't believe what that bitch does on liquor?**
A. I don't recall that.
**Q. When you say you don't recall it --**
A. I don't recall.
**Q. It never happened or you just don't recall?**
A. I don't recall. I don't recall anybody saying that to me. I --
**Q. Where is your union grievance now?**
A. They called me in and wanted to know if -- they were trying to make a big push on getting this thing through right away, and I was sick. They called me actually when I was sick, and they said that the grievance was at the end of the line type thing, and they said I got the least amount of punishment that I could get for something like that. A written notice was no more than nothing, and that if they took it to, I think the word the guy used was arbitration, and they found in favor of the company that might not be a good thing in this court thing. So, they said we are going to change the wording around to this to say that

Page 168

you allegedly told Rick Brookhouser to look at that picture. The big word there is allegedly, and I wasn't feeling -- I said, whatever. Whatever. It didn't matter.
**Q. Who told you that they were going to change the wording because they were worried about the court thing?**
A. I don't know. Somebody called me. I think it was somebody out of Portland. I don't know.
**Q. Was it Wayne Thompson?**
A. I don't recall.
**Q. Was it Chuck McRay?**
A. I don't recall.
**Q. Was it Don Willner?**
A. I don't think I have ever talked to him. I would like to, but I don't think I have.
**Q. Why would you like to talk to him?**
A. I don't know. It seems like he's got his poop in a pile.
**Q. What makes you think that?**
A. I don't know. He's an old guy. You know, I like old guys. We have to take care of our senior citizens.
**Q. So you have met him?**
A. No.
**Q. How do you know he's an old guy?**

Page 189

what you are saying?
MR. CORDES: He has got it.
MR. BONIN: I need your complete supervisory file.
MR. CORDES: Don't worry about it. He's got it. His signature is being reserved.
[Signature reserved]
[Deposition ended at 5:13 p.m.]

Page 190

10716 "A" Street South, Suite 4
Tacoma, Washington 98444
Seattle: (253) 838-1282 Tacoma: (253)627-7129

September 24, 2008

Mr. Rick Cordes
2625 B Parkmont Lane SW
Olympia, WA 98502

Dear Mr. Cordes,

You have received a copy of your client's deposition. Since he did not waive signature, we are now requesting that he read and sign this deposition.

Please do not make any marks on this transcript. All corrections are to be made on the attached correction sheet, where you will indicate the page, line number and reason for any change you have made. Please sign this correction sheet whether you made any changes or not. This correction sheet will be filed with your deposition after copies have been made for each attorney.

Please return to this office within 30 days at 10716 "A" Street South, Suite 4, Tacoma, Washington 98444.

Sincerely,

Karie Taylor
Groshong-Quaintance
Court Reporters

Page 191

CORRECTION SHEET

CASE NAME: Olson v. OPP
DEPOSITION OF: Randy Ward
DATE TAKEN: July 25, 2008
REPORTER: Karie A. Taylor

PAGE LINE # CORRECTION & REASON (please print)

----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------

---------------- ----------------------
DATE SIGNATURE

Page 192

CERTIFICATE

STATE OF WASHINGTON )
) SS.
COUNTY OF PIERCE )

THIS IS TO CERTIFY that I, Karie A. Taylor, Notary Public in and for the State of Washington, residing at Bonney Lake, reported the foregoing deposition; said deposition being taken before me as a Notary Public on the date herein set forth; that the witness was first by me duly sworn; that said deposition was taken by me in shorthand and thereafter transcribed by me, and that same is a full, true and correct record of the testimony of said witness, including all questions, answers and objections, if any, of counsel.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor am I financially interested in the outcome of the cause. IN WITNESS WHEREOF I have hereunto set my hand and affixed my official seal this 24th day of September, 2008.

--------------------------------
Notary Public in and for the State of Washington, residing at Bonney Lake