# EXHIBIT

# K

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

-----------------------------------------------------------

SARAH OLSON f/k/a Sarah            )
Grinenko,                          )
                                   )
          Plaintiff,               )
                                   )
     vs.                           )   No. C-07-5402
                                   )
OLYMPIC PANEL PRODUCTS, LLC a      )
Washington State Limited           )
Liability Company, Dwight Midles   )
and "Jane Doe" Midles,             )
individually and in the marital    )
community composed thereof,        )
Mel Matson and "Jane Doe"          )
Matson, individually and in the    )
marital community composed         )
thereof, Sean Scupine and "Jane    )
Doe" Scupine, individually and     )
in the marital community           )
composed thereof, Shane            )
Scupine and "Jane Doe" Scupine,    )
individually and in the marital    )
community composed thereof,        )
Brandon "Bling" Thompson and       )
"Jane Doe" Thompson individually   )
and in the marital community       )
composed thereof, Raymond Doyle    )
and "Jane Doe" Doyle individually  )
and in the marital community       )
composed thereof, Robert "Bob"     )
Pierson and "Jane Doe" Pierson,    )
individually and in the marital    )

## Page 2

```
 1   community composed thereof,    )
     Eric Dobson and "Jane Doe"      )
 2   Dobson, individually and in the  )
     marital community composed      )
 3   thereof, and The International     )
     Association of Machinists,          )
 4   Woodworkers Local Lodge W-38,  )

 5          Defendants.         )
     ---------------------------------------------------------
 6         DEPOSITION OF BRANDON THOMPSON
     ---------------------------------------------------------
 7
     Deposition taken at:      1800 Olympic Hwy South
 8              Shelton, WA 98584
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24          Deposition Taken: July 27, 2008   1:00 PM
25          Reported by Karie A. Taylor, License #3081
```

## Page 3

```
 1              APPEARANCES
 2   For the Plaintiff:    Mr. John R. Bonin
                           Bonin & Cook, PS
 3                         Attorneys at Law
                           1800 Olympic Hwy S., Ste 1,2,3
 4                         Shelton, WA 98584
 5   For the Defendants:    Ms. Elizabeth P. Martin
                            Gordon, Thomas, Honeywell,
 6                          Malanca, Peterson & Daheim
                            Attorneys at Law
 7                          1201 Pacific Ave, Ste. 2100
                            Tacoma, WA 98401
 8
 9   Also in Attendance:     Mr. Dwight Midles
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1              INDEX
     EXAMINATION BY MR. BONIN: ------------------- 5 - 154
 2
     EXAMINATION BY MS. MARTIN: ----------- No Examination
 3
     REPORTER'S CERTIFICATE: ---------------------- 157
 4
 5              EXHIBITS
     Exhibit #        Description
 6
 7   1          OPP Form
 8   2          OPP Hourly Action Form
 9   3          Amended Complaint
10   4          OPP Notice to Employee
11   5          Wayne Thompson Question Outline
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 5

```
 1         The deposition of BRANDON THOMPSON
 2   was taken on July 24, 2008, at 1800 Olympic Hwy S,
 3   Shelton, Washington, before Karie A. Taylor, Notary Public
 4   in and for the State of Washington.
 5
 6              * * *
 7   BRANDON THOMPSON,        having first been duly sworn
 8              upon oath by the Notary,
 9              testified as follows:
10              EXAMINATION
11   BY MR. BONIN:
12   Q. Good afternoon, Mr. Thompson.  My name is John Bonin.
13     I am the attorney representing Sarah Olson and Sarah
14     Grinenko.  I'm here today to conduct what is known as
15     a deposition.  I understand, sir, that you are not
16     represented by counsel?
17   A. That's correct.
18   Q. So you are functioning as your own counsel today; is
19     that correct?
20   A. That's correct.
21   Q. Have you ever had a deposition taken before?
22   A. No.
23   Q. A deposition is a court proceeding.  You have been
24     sworn in, and I am entitled to ask you any questions
25     reasonably calculated to lead to discoverable
```

1       happened and how I know her.

2   Q.  But you already knew about the accusations because you

3       already had a copy of that document?

4   A.  Right.

5   Q.  Is that right?

6   A.  Right, I got this from the union hall is when I met

7       Karissa.

8   Q.  Did you have it in your hands --

9   A.  No, I did not.

10  Q.  -- when you walked in and talked to Mr. Midles?

11  A.  No.

12  Q.  The first question he asked you was how you knew Sarah

13      or what?

14  A.  Do I know Sarah?

15  Q.  Do you know Sarah?

16  A.  Yes.

17  Q.  Let's talk about it.  Do you know Sarah?

18  A.  From the time that Sean -- when Sean introduced me to

19      her that's when I met her.

20  Q.  How did Sean introduce you to her?

21  A.  He wanted -- he wanted to know if it was okay if she

22      came over to my house and watched the boxing fight

23      with all of us, and I didn't know her.  I was like,

24      well, is she a nice girl?  She isn't the type to get

25      wild and stupid or is she polite, and he's like, yeah,

1      she's all right.  She's okay.  I'm with her.  That's

2      my girlfriend so to speak, and that's when he brought

3      her over to my house that Saturday.  That's the first

4      time I met her.

5   Q.  Is it the same day?

6   A.  Same day what?

7   Q.  Was it the same day that he called you and had this

8      conversation with you that he brought her over to your

9      house?

10  A.  Yeah, it was the day of the boxing fight.  Yeah, I

11     invited him over to the boxing fight prior to that

12     day.

13  Q.  Who else was at the boxing fight?

14  A.  It was me, Sean, her, Jason, Nicky, there was a whole

15     bunch of people over there, Ron, and I think this guy

16     named Jake, my next door neighbor, and this guy named

17     Jacob.

18  Q.  Who was your next door neighbor?

19  A.  He just got back from Iraq and his name is Cook.

20  Q.  That's the last name?

21  A.  First name.

22  Q.  What's his last name?

23  A.  I don't know his last name.

24  Q.  Your address is 849 Avalon.  Is he 851 or 847 or what

25     is the address?

1  Q.  What did she say?

2  A.  She said, because I've done certain things.  I said,

3      what things?  She said, don't worry about it.  It's no

4      big deal.  I said, well, if you need to talk to

5      anybody I will listen if you need to talk to anybody.

6      She said, thank you.  Your very nice, Brandon.  Then

7      she brought up, hey, if you ever want any free food

8      come see me at Jack in the Box.  I'll give you free

9      food.

10  Q.  Where was this conversation taking place?

11  A.  Right in front of the smoke shack.  It's right as you

12      walk into the place.  It's out in the smoke shack.

13      It's about 20 feet over here to the right.

14  Q.  Did she ever say anything else to you?

15  A.  She did say that she was tired of old men touching

16      me.

17  Q.  When did she say that?

18  A.  The same time we were talking about the Jack in the

19      Box.  That just popped in my head.  She said that too.

20  Q.  Tired of old men touching me; how old are you, sir?

21  A.  I'm 25.

22  Q.  How old is Sarah?

23  A.  Only 21.

24  Q.  Did you ask her, what do you mean?  I'm tired of old

25      men touching me?

1    A.   I said, is there something bothering you?  I said, is

2         there a problem because she said old men.  Old men on

3         day shift is what she said.

4    Q.   What did you say?

5    A.   I was like, who are they?  She wouldn't say none of

6         them, and that's it.

7    Q.   You said she was talking --

8    A.   Then I was like, if you need any help or anything just

9         let me know, and she was like, all right, and that's

10        when the conversation ended, and I said, are you okay

11        and she said, yes.  Then she was like, if you hear

12        anything said about me please tell them to stop.  I

13        was like, okay, no problem, and then shed asked me if

14        I wanted free food at Jack in the Box.  That was the

15        last conversation I had with her.

16   Q.   That's the extent of your conversation with her?

17   A.   That's about it.

18   Q.   I want to make sure you are giving me as much detail

19        as you can remember.

20   A.   That's all the detail I got right there.

21   Q.   Did you tell any of this to Mr. Midles?

22   A.   Yes, I did.

23   Q.   When did you tell it to Mr. Midles?

24   A.   When I was in the thing talking to him about what

25        happened.

1    Q.   Talking about before you were written up or after you

2        were written up?

3    A.   After I was written up.

4    Q.   When you were in the thing talking to him about what

5        happened but you had already been written up so why

6        are you having this conversation with Mr. Midles?

7    A.   No, when I was getting written up, excuse me.

8    Q.   You mean at the time that you are getting the document

9        or before you are getting the document?

10   A.   Before I got the document.

11   Q.   So you are having this conversation in front of

12        Mr. Matson and Mr. Midles?

13   A.   Correct.  He asked if I touched her or anything like

14        that and that's all I answered to him.  All I know is

15        that if -- I don't know the reason why that she would

16        say these things, you know, tired of people touching

17        me -- I mean, old men on day shift touching me and

18        have you heard anything said about me.  Why would she

19        say that?  What kind of person is she?  I didn't

20        really know her too well.  You know your client, don't

21        you?  You know what kind of person she is?

22   Q.   What are you telling me in terms of the time line?

23        When did you physically touch Ms. Grinenko in terms of

24        the time line of when it happened to the Jack in the

25        Box incident?  Give me a step-by-step procedure.

```
 1        of how long you still have?

 2             MR. BONIN:  No.

 3             MS. MARTIN:  Okay.

 4   A.   My question was to you -- can this be off the record?

 5   Q.   We need to keep moving here.  We have gotten to the

 6        write up stage, okay?

 7   A.   Uh-huh, yes.

 8   Q.   Have you told me at this point all of your contact and

 9        all of your communications with Sarah Grinenko?

10   A.   That's it.  That's all I really ever talked to her.

11        That time I explained to you about the boxing fight

12        and the last time when I saw her on spreader three.

13        That's all I ever --

14   Q.   I mean, we have thoroughly covered all of your

15        knowledge and information about Sarah Grinenko at this

16        point?

17   A.   That's correct.

18   Q.   I know nothing differently than what you told the

19        union and what you told Mr. Midles; is that correct?

20   A.   Well, the other employee friend of mine that they had

21        sex with her.  Her boyfriend Sean Scupine at the time.

22   Q.   Who told you that?

23   A.   Sean did.

24   Q.   When did he tell you that?

25   A.   It was later on down the road.  I can't remember which
```

1   Q.  A moment ago you said she was dating them both at the

2       same time.

3   A.  I never said both at the same time.  I seen her -- she

4       talked to them.  She go over and talk to them and talk

5       to the other one.

6   Q.  Should I ask the court reporter to read back what you

7       said about dating them at the same time?

8   A.  I don't know at the same time.

9            [Pending answer read back]

10  A.  Yeah, she was seeing both of them.

11  Q.  You are saying she was seeing both of them?

12  A.  Not dating -- not dating both of them at the same

13      time.

14  Q.  When was she --

15  A.  She was seen with both of them.

16  Q.  When was she seeing both of them?

17  A.  I don't think they were dating both at the same time.

18  Q.  When did you hear she was seeing both of them?

19  A.  I heard that after I think Shane broke up with her, I

20      think.  I heard about that.

21  Q.  Shane broke up with her?

22  A.  Yeah, or something like that because she is was too

23      crazy and she drinks too much alcohol.

24  Q.  That was before the boxing match?

25  A.  Yeah, I heard all kinds of stuff like that going

1     around about her.

2  Q.  Who did you hear that from?

3  A.  I can't -- it goes around at the mill.  Stuff travels

4     fast around there.  It's like a --

5  Q.  These conversations are taking place at the mill?

6  A.  There's certain people that said things like Shane

7     told people.

8  Q.  Let's talk about what you heard.  Before the boxing

9     fight you heard that she was dating a lot of people at

10    work.  You mentioned Sean and Shane.  Who else did you

11    hear she was dating at work?

12  A.  Nobody.

13  Q.  Those two people qualify as a lot of people to you?

14  A.  I don't know names.  I just heard other people.

15    That's all.

16  Q.  What other people have you heard?

17  A.  I didn't hear no other names.  I just told you that.

18  Q.  What did you hear?

19  A.  I heard that she was dating other people at work.

20    That's what I heard.

21  Q.  Give me the specifics.  Who told you she was dating

22    other people?

23  A.  I don't got no names.  It's going around at lunch or

24    if you are outside at the smoke shack you hear it.

25    Everybody could see what kind of person she was.

1   Q.  Everyone could see?  What kind of person was she?

2   A.  That's what they were saying.

3   Q.  Who is they?

4   A.  I don't -- I didn't look at who all was talking.  That

5       ain't none of my business.  You hear stuff.  That's

6       it.  Ain't none of my business to really be like, hey,

7       who is that?  Who are you -- who was that?  Who are

8       you talking about?  I'm not like that.  That's all.

9   Q.  But you hear --

10  A.  But Sean told me he did date her.

11  Q.  Did Sean tell you that he did sleep with her?

12  A.  Yes, and that she dated his brother too.

13  Q.  When --

14  A.  That's what I was telling you.

15  Q.  Sean told you that he dated her.  When did he tell you

16      that he dated her?

17  A.  I don't know.  When he was dating her when he came

18      over to my boxing fight.

19  Q.  When did he tell you that she was dating his brother

20      too?

21  A.  That was before.  They didn't date at the same time.

22      Man, I just told you that.  They dated before -- Turbo

23      is his name or Shane Scupine dated her before Sean

24      did.  That's what Sean told me.

25  Q.  When did he date her?

1    A.   I seen Sarah walk around with Turbo a lot.  So lead to

2         believe -- I mean, they had been over at each other's

3         houses and stuff like that.

4    Q.   Who told you --

5    A.   Sean did.  I just told you.  What are you getting at,

6         man?

7    Q.   Where were you standing when someone told you that she

8         was dating Shane Scupine?

9              MS. MARTIN:  Objection.  Form.

10   A.   When someone told me?  I just told you Sean told me

11        that.

12   Q.   Where were you standing when that was said?

13   A.   Outside.

14   Q.   Outside of where?

15   A.   In the smoke shack.

16   Q.   Who else was there?

17   A.   Who knows.  A lot of people go out there.

18   Q.   Where were you standing when you heard that she was a

19        drunk?

20             MS. MARTIN:  Objection.  Form.

21   A.   I heard that she was a drunk?  Outside.

22   Q.   Who told you that?

23   A.   Sean did.

24   Q.   When?

25   A.   This is before the boxing fight.

1       victim of a sexual assault?

2           MS. MARTIN:   Objection.   Form.

3    A.  I heard something about it after we got all of this

4        lawsuit stuff.   I heard that from Sean or Shane.   I

5        can't remember which one it was.   I guess she was

6        assaulted by a couple of guys or something like that.

7        I never paid attention.   That's the only thing I ever

8        heard about it.

9    Q.  When did you hear about that?

10   A.  A while back.   But I never heard about what happened

11       or nothing like that.   I just heard that she got mixed

12       up with two guys.   That's it.   I didn't know it was an

13       assault.   I didn't know she got assaulted or anything

14       like that.   Mixed up with two guys and got in trouble.

15   Q.  When did you hear about it?

16   A.  This is after we already got all of this stuff.

17   Q.  What does "all this stuff" mean?

18   A.  This letter from the union.

19   Q.  What letter?

20   A.  Not the letter from the union but the document.

21   Q.  What document?

22   A.  The document 17.

23   Q.  Are you talking about this document right here that

24       has got the caption right there?   Do you see what it

25       says there?

**OLYMPIC PANEL**
Products



EXHIBIT
4
hT 7:24-08

# NOTICE TO EMPLOYEE

Name _Brandon Thompson_

Plant _Olympic Panel_                                          P.R. No. _____

The reason for this warning is explained below. This will be reviewed after twelve (12) months and if no futher discipline has occurred in the prior twelve months, the prior discipline will not be used as justification for progressive discipline after that period.

☒ Unauthorized Absence            ☐ Violation of Smoking Rules
☐ Late to Work                    ☐ Violation of Posted Rules
☐ Loafing                         ☐ Other (Explained in Detail)

Remarks: _This is a Inhouse Suspension Given_
_To Brandon Thompson For Poor Job Performance_
_As Shown By his excessive Absents from_
_Work_
_Any Farther Such Absent in the Next_
_6mb will result in displinary Action_
_up to And including Termination._

Date: _3-17-08_

_(signature)_
SUPERVISOR

ROUTE:
White to Employee
Canary to Personnel
~~o~~ Supervisor
~~~enrod~~ to Union

THOMAS PRINTING, SHELTON, WA

OPP000627



**OLYMPIC PANEL**
Products

# NOTICE TO EMPLOYEE

Name ___Brandon Thompson___

Plant ___Olympic Panel___                                P.R. No. _____

The reason for this warning is explained below. This will be reviewed after twelve (12) months and if no futher discipline has occurred in the prior twelve months, the prior discipline will not be used as justif-ication for progressive discipline after that period.

- ☒ Unauthorized Absence
- ☐ Late to Work
- ☐ Loafing

- ☐ Violation of Smoking Rules
- ☐ Violation of Posted Rules
- ☐ Other (Explained in Detail)

Remarks: ___This is a Written Warning Given to Brandon for Poor Job Performance As shown by his excessive Absents from Work Any Further such Absents will Result in deprivary Action being Taken up to And including Termination.___

___Brandon: You Are Now 1 incendent from A suspension This Problem Could Cost you your Job.___

Date: ___2-6-08___

___[signature]___
SUPERVISOR

ROUTE:
White to Employee
  nary to Personnel
  ink to Supervisor
Goldenrod to Union

THOMAS PRINTING, SHELTON, WA

# OLYMPIC PANEL
Products

# NOTICE TO EMPLOYEE

Name _Brandon Thompson_

Plant _Olympic Panel_                                     P.R. No. _____

The reason for this warning is explained below. This will be reviewed after twelve (12) months and if no futher discipline has occurred in the prior twelve months, the prior discipline will not be used as justification for progressive discipline after that period.

☑ Unauthorized Absence                ☐ Violation of Smoking Rules
☐ Late to Work                          ☐ Violation of Posted Rules
☐ Loafing                               ☐ Other (Explained in Detail)

Remarks: _This is a Written Verbal Warning_
_Given To Brandon For Poor Job Performance_
_As Shown By his excessive Absents from_
_work. Any Further such Absents from_
_work will result in further displinary_
_Action being Taken up to and including_
_Termination_

Date: _1-23-08_

_[signature]_
SUPERVISOR

ROUTE:
White to Employee
Canary to Personnel
k to Supervisor
...Idenrod to Union

THOMAS PRINTING, SHELTON, WA

OPP000629



## OLYMPIC PANEL
Products

# NOTICE TO EMPLOYEE

Name _Brandon Thompson_

Plant _Olympic_                                    P.R. No. _6·25-07_

The reason for this warning is explained below. This will be reviewed after twelve (12) months and if no futher discipline has occurred in the prior twelve months, the prior discipline will not be used as justif- ication for progressive discipline after that period.

❑ Unauthorized Absence            ❑ Violation of Smoking Rules
❑ Late to Work                         ❑ Violation of Posted Rules
❑ Loafing                                ❑ Other (Explained in Detail)

Remarks: _On 5-18-07 you approached a fellow female co-worker and made inappropriate physical contact with her. In your defense you cited that she had been over to your house the night before to watch a TV fight with other employees and that you were only greeting her. Never the less we still consider this to be inappropriate behavior and it will not be tolerated by Olympic. This is a formal written warning And it should not happen again or further disciplinary action could occur, including discharge._

Date: _____

_____
SUPERVISOR

ROUTE:
hite to Employee
Janary to Personnel
Pink to Supervisor
Goldenrod to Union

THOMAS PRINTING, SHELTON, WA

OPP000630

# OLYMPIC PANEL
Products

# NOTICE TO EMPLOYEE

Name _Brandon Thompson_

Plant _Olympic Panel_                                       P.R. No. _____

The reason for this warning is explained below. This will be reviewed after twelve (12) months and if no futher discipline has occurred in the prior twelve months, the prior discipline will not be used as justification for progressive discipline after that period.

☐ Unauthorized Absence         ☐ Violation of Smoking Rules
☐ Late to Work                 ☒ Violation of Posted Rules
☐ Loafing                      ☐ Other (Explained in Detail)

Remarks: _This is a Written Warning Given to Brandon for Poor Job Performance as Shown By Breaking a Safety Rule and Throwing Knots. Any farther displanary Action will be Taken if this happen Again up to and including Termination._

Date: _6 5 07_

_____
SUPERVISOR

ROUTE:
White to Employee
...nary to Personnel
...k to Supervisor
Goldenrod to Union

THOMAS PRINTING, SHELTON, WA

OPP000631

# OLYMPIC PANEL
Products

# NOTICE TO EMPLOYEE

Name _Brandon Thompson_

Plant _Olympic Panel_                              P.R. No. _____

The reason for this warning is explained below. This will be reviewed after twelve (12) months and if no futher discipline has occurred in the prior twelve months, the prior discipline will not be used as justif-ication for progressive discipline after that period.

- ☐ Unauthorized Absence
- ☐ Late to Work
- ☐ Loafing
- ☐ Violation of Smoking Rules
- ☐ Violation of Posted Rules
- ☒ Other (Explained in Detail)

Remarks: _This is a written warning given to Brandon Thompson for poor job performance as shown by his excessively long breaks. Any further incerdence of long breaks will rbult in farther displinary action being taken up to & including Termination_

Date: _6-4-07_

_James A Ward_
SUPERVISOR

ROUTE:
White to Employee
  ~ary to Personnel
  . to Supervisor
Goldenrod to Union

THOMAS PRINTING, SHELTON, WA

OPP000632

# OLYMPIC PANEL Products

# NOTICE TO EMPLOYEE

Name _Brandon Thompson_

Plant _Olympic Panel_                                          P.R. No. _____

The reason for this warning is explained below. This will be reviewed after twelve (12) months and if no futher discipline has occurred in the prior twelve months, the prior discipline will not be used as justification for progressive discipline after that period.

☑ Unauthorized Absence                    ☐ Violation of Smoking Rules
☐ Late to Work                            ☐ Violation of Posted Rules
☐ Loafing                                 ☐ Other (Explained in Detail)

Remarks: _This is a three day suspension given to Brandon Thompson for excessive absents from work. Any further absents will result in further displinary action being taken._

Date: _5-25-06_

_[signature]_
SUPERVISOR

ROUTE:
White to Employee
Canary to Personnel
_ to Supervisor
Goldenrod to Union

THOMAS PRINTING, SHELTON, WA

OPP000633



## OLYMPIC PANEL
Products

# NOTICE TO EMPLOYEE

Name _Brandon Thompson_

Plant _Olympic Panel_                    P.R. No. _____

The reason for this warning is explained below. This will be reviewed after twelve (12) months and if no futher discipline has occurred in the prior twelve months, the prior discipline will not be used as justif-ication for progressive discipline after that period.

☑ Unauthorized Absence
☐ Late to Work                    ☐ Violation of Smoking Rules
☐ Loafing                         ☐ Violation of Posted Rules
                                  ☐ Other (Explained in Detail)

Remarks: _This is a Written Warning given to Brandon for poor Work Performance as seen by his excessive Absents from Work. Brandon Need to Improve or further displawary Action will be Taken; up to And including Terminations._

Date: _2-28-06_

_[signature]_
SUPERVISOR

ROUTE:
  ite to Employee
  ary to Personnel
  nk to Supervisor
  idenrod to Union

THOMAS PRINTING, SHELTON, WA

OPP000635



## OLYMPIC PANEL
Products

# NOTICE TO EMPLOYEE

Name _Brandon Thompson_

Plant _Olympia Panel_                                                           P.R. No. _____

The reason for this warning is explained below. This will be reviewed after twelve (12) months and if no futher discipline has occurred in the prior twelve months, the prior discipline will not be used as justification for progressive discipline after that period.

- ☒ Unauthorized Absence
- ☐ Late to Work
- ☐ Loafing

- ☐ Violation of Smoking Rules
- ☐ Violation of Posted Rules
- ☐ Other (Explained in Detail)

Remarks: _This is a written warning given to Brandon for poor job performance as shown by his excessive absents from work his absents when to improve or farther disiplanary action will be taken._

Date: _1/19/06_

_(signature)_
SUPERVISOR

ROUTE:
ite to Employee
ary to Personnel
nk to Supervisor
oldenrod to Union

THOMAS PRINTING, SHELTON, WA

OPP000636



# OLYMPIC PANEL
Products

# NOTICE TO EMPLOYEE

Name _Brandon Thompson_

Plant _Olympic Panel_    P.R. No. _____

The reason for this warning is explained below. This will be reviewed after twelve (12) months and if no futher discipline has occurred in the prior twelve months, the prior discipline will not be used as justif- ication for progressive discipline after that period.

☒ Unauthorized Absence    ☐ Violation of Smoking Rules
☐ Late to Work    ☐ Violation of Posted Rules
☐ Loafing    ☐ Other (Explained in Detail)

Remarks: _This is a written verbal warning given for_
_Poor Job Performance as shown by Brandon_
_Excessive Absents from work Brandon needs to_
_improve or further disiplinary action will be taken_

Date: _11/29/05_

_____
SUPERVISOR

ROUTE:
ite to Employee
_nary to Personnel
nk to Supervisor
Goldenrod to Union

THOMAS PRINTING, SHELTON, WA



# OLYMPIC PANEL
Products

## NOTICE TO EMPLOYEE

Name _Karisa Compton  Ivan Martinez  Chuck Zajak  John Olsoe_
_Dennis Richard  Druex Crateau  Blake Simmon  Branden Thompson_

Plant _Olympic Panel_ _____ P.R. No. _____

The reason for this warning is explained below. This will be reviewed after twelve (12) months and if no futher discipline has occurred in the prior twelve months, the prior discipline will not be used as justif-ication for progressive discipline after that period.

- ☐ Unauthorized Absence
- ☐ Late to Work
- ☐ Loafing

- ☐ Violation of Smoking Rules
- ☐ Violation of Posted Rules
- ☑ Other (Explained in Detail)

Remarks: _This is A Written Verbal Warning Given to #1 & #2_
_Spreader Crews For Poor Job Performance As Shown_
_by There Long Break (swamp Break) Causing Press to_
_be Open & Lose in Production._

Date: _9-16-05_

_[signature]_
SUPERVISOR

ROUTE:
White to Employee
nary to Personnel
'ink to Supervisor
Goldenrod to Union

THOMAS PRINTING, SHELTON, WA.

1                          CERTIFICATE

2    STATE OF WASHINGTON      )

3                            )        SS.

4    COUNTY OF PIERCE         )

5         THIS IS TO CERTIFY that I, Karie A. Taylor, Notary
     Public in and for the State of Washington, residing at
6    Bonney Lake, reported the foregoing deposition; said
     deposition being taken before me as a Notary Public on the
7    date herein set forth; that the witness was first by me
     duly sworn; that said deposition was taken by me in
8    shorthand and thereafter transcribed by me, and that same
     is a full, true and correct record of the testimony of
9    said witness, including all questions, answers and
     objections, if any, of counsel.
10        I further certify that I am not a relative or employee
     or attorney or counsel of any of the parties, nor am I
11   financially interested in the outcome of the cause.  IN
     WITNESS WHEREOF I have hereunto set my hand and affixed my
12   official seal this 12th day of October, 2008.

13

14

15

16        -------------------------------------

17
               Notary Public in and for the State
18             of Washington, residing at Bonney Lake

19

20

21

22

23

24

25