Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

SARAH OLSON
        Mrs. Olson ,

    vs.

OLYMPIC PANEL PRODUCTS, et al.
        Defendants

) Case No.:  C07-5402 BHS
)
) Declaration of John Bonin RE: Brief of
) Opposition
)
)
)
)
)

The undersigned, pursuant to RCW 9a.72.085 states:

I am John Bonin, the attorney representing Mrs. Olson in this matter.

In Plaintiff's Brief of Opposition I refer to Docket 123-2 (Declaration of John Bonin RE: Plaintiff's Response to Untimely Motion for Attorney Fees and Cost Bill), which was filed on August 11, 2008.  In my previously filed declaration I attached as Exhibit A a letter written to me by Mr. Wilner dated April 4, 2008.  I point out that at page 2, at the first paragraph Mr. Wilner clearly states he will make the same witnesses available for deposition in Olson at later, mutually convenient dates.  In my previously filed declaration I attached as Exhibit B a letter I wrote back to Mr. Wilner.  The first paragraph of that letter clearly responds that I would do what counsel wants only if counsel agreed to refrain from noting a threatened motion for summary judgment until I obtained my depositions.  I originally wanted to depose witnesses who were going to be present in one case on the same day for this case.  I was met with objections to that.  At the time of my first suggestion I was trying to save costs for everyone.  In my previously filed declaration

I attached as Exhibit C a copy of the previously filed declaration of Sarah Olson discussing her corrections and her support for continuance of the pending motion for summary judgment. She makes it clear that the corrections were her corrections.

As plaintiff's counsel I believed that my motion to continue in order to allow me to engage in the pending discovery would be allowed when I filed my motion to continue. I selected the date of filing under a misunderstanding as to what I thought the rule required as to time and with an understanding that motions for hearing on shortened time were abrogated. I wrote in the caption that I was requesting telephonic hearing at the Court's earliest convenience. I was requesting telephonic hearing at the court's earliest convenience under the mistaken belief that I would have time to respond if my motion were denied.

Attached hereto as Exhibit A to this declaration is a true and accurate copy of relevant portions of Deposition of Sarah Olson including Exhibits 23 and 24. At pages 2 and 6 Mrs. Olson talks about contacting the union on two different occasions and being told that they do not handle sexual harassment issues. At pages 11, 12, 14, 15, 16, 17, 19, 20, 21, 22, 23, 24, and 25 of Mrs. Olson's deposition are examples were Defendant failed to cooperate in discovery and repeatedly attempted to mischaracterize and misstate the record. Pages 27 and 28 are exhibits 23 and 24 of Mrs. Olson's deposition showing conflicting dates of an original statement issued by Brett Simpson. Page 27 (Exhibit 23) shows the date as May 21 and page 28 (Exhibit 24) shows the date as May 1.

Attached hereto as Exhibit B is a true and accurate copy of Brett Simpson's statement with a third conflicting date. This document shows the date being May 29th. This document was

Declaration of John Bonin RE: Brief of
Opposition - 2

submitted by Defendant Union to Plaintiff as supplemental discovery after the deposition of Mrs. Olson on April 1, 2008.

Attached hereto as Exhibit C is a true and accurate copy of the West Casehead Note as to <u>St. Paul Fire and Insurance Company v. Vedatech</u>, 245 Fed.Appx.. 588, 2007 WL 2088884 (C.A.9(Cal). Pursuant to Ninth Circuit Rule 36-3 has no value in precedent and should not have been cited by Union counsel pursuant to that rule.

I refuse to participate in a childish exchange about the behavior of opposing counsel. If I elected to I could document numerous incidents of unprofessional behavior of opposing counsel. However, out of respect for this Court and the practice of law I decline to do so. My actions in this case have been motivated only by my desire and obligation to zealously advocate for my client.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is truthful and accurate.

Signed this 7th day of May 2009 in Mason County, Washington

John R Bonin

Declaration of John Bonin RE: Brief of
Opposition - 3

Exhibit *A*
Page *1* of *26*
Bonin & Cook, P.S.

1

1     UNITED STATES DISTRICT COURT

2    WESTERN DISTRICT OF WASHINGTON

3        AT TACOMA

4

5

6 SARAH GRINENKO,        )

7      Plaintiff,    )

8    vs.         ) NO. CO7-5402 BHS

9 OLYMPIC PANEL PRODUCTS, LLC, et al.,)

10      Defendants,   )

11 -------------------------------------

12

13

14      DEPOSITION OF SARAH OLSON

15       APRIL 1, 2008

16

17      Shelton, Washington

18 -------------------------------------------------------------

19

20

21      M. Jane Johnson
      Certified Court Reporter
22       CCR No. 2677
      Olympia, WA  98512
23

24

25

**FILE COPY**

Exhibit 1A
Page 2 of 28
Bonin & Cook, P.S.

19

1   left.

2   Q.   I think you're a little confused.  That did not

3   happen on May 29th, did it?

4   A.   No.

5   Q.   I was talking about May 29th.

6   A.   Oh, I'm sorry.

7   Q.   When you went to the local lodge office on May 29th,

8   who was there?

9   A.   Yvonne, the secretary, and Brett Simpson -- or not

10  Brett, sorry.  Eric Dobson.

11  Q.   And had you known that he was the president?

12  A.   No.

13  Q.   Were both of them present?

14  A.   Yes.

15  Q.   Tell me as best you can what was said by you and by

16  them at that meeting.

17  A.   I walked into the office and I talked with the

18  secretary.  I told her I needed to file a grievance on

19  sexual harassment and hostile work environment.  She

20  informed me that the union doesn't handle those sort of

21  issues and I said that was fine.  I was going to see my

22  attorney.  And at that point, Eric walked out of his

23  office and motioned me back into his office and he again

24  said that the union doesn't handle those sorts of things

25  but maybe we could figure something out.

FILE COPY

Exhibit A
Page 3 of 24
Bonin & Cook, P.S.

20

1          And he talked to me about what was

2   happening at Olympic Panel.  I informed him of some of the

3   events, some of the people that were involved.  He wrote

4   notes, took down their names, and told me that -- this is

5   when I had the meeting with Dwight and Mel -- why I didn't

6   have union representation, that we could grieve that and

7   grieve in the sexual harassment with it.  But in the

8   timeline he wanted me to provide I had to say no union

9   representation in the timeline in order for him to help

10  me.

11  Q.   Did he ask you to prepare a timeline?

12  A.   Yes, he did.

13  Q.   Did he tell you he wanted it back quickly?

14  A.   Yes.

15  Q.   Did you say you would try to have it back the next

16  day?

17  A.   Yes, I did.

18  Q.   Did you bring it back the next day?

19  A.   No, I did not.

20  Q.   Why not?

21  A.   I didn't see any reason to.

22  Q.   Why was that?

23  A.   Because he didn't motion me back there to help me

24  until I said -- I was turning my back to walk out the door

25  and I said I was going to see a lawyer.  It wasn't until

FILE COPY

Exhibit
Page __4__ of __28__
Bonin & Cook, P.S.

21

1  that point that he decided that he could help me and he

2  told me he was going to file a grievance on the denial of

3  union representation, not on sexual harassment.  If that

4  wasn't something that they could handle, I didn't see the

5  need to provide the information he already had written

6  down.

7  Q.   In the next few days did you receive a phone call

8  from Yvonne asking you where was the information you were

9  getting for Eric Dobson?

10  A.   I received a message from her.

11  Q.   Did you actually talk to her or just a message left

12  on --

13  A.   No, it was a voice mail.

14  Q.   And after you got that message, did you provide any

15  additional information?

16  A.   No, I did not.

17  Q.   When did you hire Mr. Bonin to be your attorney?

18  A.   I believe it was that same day.

19  Q.   By that same day, May 29th?

20  A.   Yes, May 29th.

21           MR. WILLNER:  Please mark this as Exhibit 5.

22                   (Exhibit No. 5 marked)

23               Would you please hand Exhibit 5 to the

24  witness?

25  Q.   (By Mr. Willner)  The court reporter has handed you

FILE COPY

Exhibit        A
Page  5  of  26
Bonin & Cook, P.S.

56

1  question.  Leading.

2  Q.  (By Mr. Bonin)  Go ahead.

3  A.  I -- no, I don't think so.  Well --

4  Q.  Did Mr. -- whose language is -- this first page right

5  here where the sections have been taken off, at whose

6  instruction did you write those words?

7  A.  Mr. Dobson's.

8  Q.  Okay, and that's where it says: March 06, personal

9  incident occurred which involved police report, asked for

10  a week off plus two days with doctor note.  Dwight Midles

11  required me to explain what had happened and also required

12  a police report copy.  And this happened without any union

13  representation?

14  A.  Yes.

15  Q.  And whose words are these?

16  A.  Mr. Dobson's.

17       MR. WILLNER:  Object to the form of the

18  question.  Leading.

19  Q.  (By Mr. Bonin)  Go ahead and answer.

20  A.  Mr. Dobson's.

21  Q.  What did Mr. Dobson tell you he was going to file a

22  grievance about?

23  A.  Being denied union representation.

24  Q.  This fax dated June 6th, it says faxed on it.

25       MR. WILLNER:  What is the exhibit number?

FILE COPY

Exhibit A
Page 6 of 28
Bonin & Cook, P.S.

57

```
 1            MR. BONIN:  Exhibit 7.

 2    Q.   (By Mr. Bonin)  Do you see where it says -- what does

 3    it say here he is going to be pursuing?

 4    A.   About sexual harassment and hostile work environment.

 5    Q.   Is that what he told you he was going to be filing

 6    his grievance about?

 7    A.   No.

 8    Q.   When you appeared -- do you remember any

 9    communications that occurred between the union and -- in

10    your presence, do you remember any communications that

11    occurred with Ms. Tahja or Yvonne Tahja?

12            MR. WILLNER:  I object to the form of the

13    question.  It doesn't identify when this occurred.

14    Q.   (By Mr. Bonin)  Go ahead and answer the question.

15    A.   We called her -- or the attorney and I called her

16    when we got back to the office to confirm with her that

17    they didn't handle sexual harassment.

18    Q.   What did Yvonne Tahja say -- were you a participant

19    in this call?

20    A.   No, I was on the speaker phone.  I was listening.

21    Q.   And did she know you were present?

22    A.   Yes.

23    Q.   What did Ms. Tahja say?

24    A.   She said that they don't handle sexual harassment

25    issues but that Eric Dobson had a new idea or theory he
```

FILE COPY

Exhibit A
Page 7 of 28
Bonin & Cook, P.S.

58

1  was going to go on.

2  Q.   Did the union offer to pay for Dr. Hawkins to write a

3  report with regard to your competency?

4  A.   No.

5        MR. BONIN:  I need to find my --

6        MR. WILLNER:  Off the record, are we --

7        MR. BONIN:  No, I don't want to be off the

8  record.  This is my session, counsel.

9           I'm going to go ahead and have these

10  marked.  If you need to ask something on the record --

11  before we went off the record, you made a disparaging

12  statement about me.  I'm not going to allow that.  If yc

13  want to talk, you can talk on the record.  And I mean n

14  disrespect, Mr. Willner, but you did say something

15  disparaging.

16        MR. WILLNER:  On the record, have you found

17  Exhibit 5, court reporter?

18        COURT REPORTER:  I do not have it.

19        MR. WILLNER:  That's all I wanted to know.  We

20  will find it.

21        MR. BONIN:  Would you please mark these?

22                 (Exhibit Nos. 21 & 22 marked)

23  Q.   (By Mr. Bonin)  Would you take a look at what has

24  been marked as Olson Exhibits 21 and 22?  What do those

25  documents appear to be to you?

FILE COPY

-----------------------------------------

Exhibit ___A___
Page __8__ of __28__
Bonin & Cook, P.S.

59

1  A.  Business cards.

2  Q.  Okay.  Exhibit 21, did you hear counsel state that

3  Mr. Thompson was not Oregon based earlier?

4  A.  Yes.

5  Q.  What does Exhibit 21 state?  What is the address for

6  Mr. Thompson?

7  A.  Gladstone, Oregon.

8  Q.  What is he listed as?

9  A.  The business representative.

10  Q.  Okay, turning to Exhibit 22, what does that document

11  appear to be?

12  A.  Another business card.

13  Q.  Whose business card would that be?

14  A.  Eric Dobson's.

15  Q.  What does it say in terms of who he is?

16  A.  The president.

17  Q.  Of where?

18  A.  The local woodworkers union lodge.

19  Q.  And who was it that informed you that the union does

20  not handle these types of issues?

21  A.  Eric Dobson.

22  Q.  Who was it who caused you to turn your back and walk

23  out -- start to walk out the door before you mentioned you

24  were on your way to see an attorney?

25  A.  Eric Dobson.

FILE COPY

------------------------------------------
JANE JOHNSON, Court Reporter, Olympia, WA (360) 943-7698

Exhibit ___A___
Page __9__ of __28__
Bonin & Cook, P.S.

60

1   Q.   Did Mr. Thompson during that meeting -- oh, by the

2   way, you were asked to appear at a meeting by the union

3   to discuss the facts and circumstances?

4   A.   The one Wayne Thompson was at?

5   Q.   Yes.

6   A.   Yes.

7   Q.   Now in terms of time frame, on May 29th you go in to

8   request the union's help; is that right?

9   A.   Yes.

10  Q.   You're sent away and then called back when you say

11  you're on your way to see an attorney.

12  A.   Yes.

13  Q.   You're told in that organization the union does not

14  handle this type of grievance.

15  A.   Yes.

16       MR. WILLNER:   Object to the form of the

17  question.  Leading.

18  Q.   (By Mr. Bonin)  You're told on the telephone that the

19  union does not handle this kind of grievance.

20  A.   Yes.

21       MR. WILLNER:   Object to the form of the

22  question; leading.

23  Q.   (By Mr. Bonin)  And then Mr. Thompson becomes

24  involved in some way, or the grievance is filed; is that

25  right?

Exhibit _A_
Page _10_ of _25_
Bonin & Cook, P.S.

61

1   A.   Yes.

2   Q.   Did you approve of that grievance in advance?

3   A.   No.

4   Q.   Were you asked anything with respect to that

5   grievance?

6   A.   No.

7   Q.   You had wanted to have a grievance filed on that very

8   issue --

9   A.   Yes.

10  Q.   -- of sexual harassment.

11           MR. WILLNER:   Object to the form.   Leading.

12  Q.   (By Mr. Bonin)   Go ahead.

13  A.   Yes.

14  Q.   And when you had gone in and asked for that very

15  issue, the filing of the grievance on sexual harassment,

16  you were told what?

17  A.   That they don't handle that sort of issue.

18  Q.   And then a grievance -- did Mr. Dobson interview you

19  during that time period?

20  A.   On May 29th, yes.

21  Q.   Was this before or after you told him you were on

22  your way to see your father's attorney?

23  A.   After.

24  Q.   Did he interview you in detail with respect to what

25  happened?

FILE COPY

-----------------------------------------



Exhibit _A_
Page _II_ of _2?_
Bonin & Cook, P.S.

62

1  A.    Yes.

2  Q.    Did the content of the questions that he asked you --

3  are those the same things that are contained in what has

4  been marked -- did he spend time asking you questions

5  about the same thing that had been reduced to writing in

6  Exhibit 18?

7          MR. WILLNER:   Object to the form of the

8  question; leading.

9  Q.    (By Mr. Bonin)   Did he take notes?

10  A.    Yes.

11  Q.    Did he ask you the names of people involved?

12  A.    Yes, he did.

13  Q.    Did he write down the names of the people involved?

14  A.    Yes, he did.

15  Q.    On Exhibit 14, you responded probably and you used

16  the word probably a lot during the examination.   Do you

17  see up here in the left-hand corner -- what does it say

18  right there on Exhibit 14?

19  A.    Sent certified.

20  Q.    Is there a second page?

21  A.    No.

22  Q.    On Exhibit 13 I believe you also used the word

23  probably in terms of when the date was received.   Do you

24  remember that?

25  A.    Yes.

FILE COPY

----------------------------------------

Exhibit _A_
Page _12_ of _25_
Bonin & Cook, P.S.

63

1    Q.    Take a look at the left-hand corner.  What is the

2    date?

3    A.    July 6, 2007.

4    Q.    Turn to the second page which appears to be a fax

5    certification of delivering.  Can you see the date of the

6    round stamp on that?

7    A.    Yes.

8    Q.    What does the date say?

9    A.    July 11, 2007.

10   Q.    If you look at the content of the July 6th letter

11   sent July 11th, do you see what date it says?

12   A.    July 13, 2007.

13   Q.    What are they asking you to do between July 11th and

14   July 13th?  Take a look at that exhibit.

15   A.    To get a letter or note to me prior to that date

16   would be most helpful regarding your mental state at the

17   time for submission of the grievance.

18   Q.    Did they offer to send you to counseling at their

19   expense to get such a letter?

20   A.    No.

21   Q.    And do you remember what Mr. Willner said about

22   Mr. Thompson being properly designated as a party

23   representative here today?

24   A.    Yes.

25   Q.    Take a look at Exhibit No. 13.  Can you look at the

FILE COPY

Exhibit _A_
Page _13_ of _25_
Bonin & Cook, P.S.

64

1    top of that and what the address is?

2    A.    Oregon, Gladstone.

3    Q.    So Mr. Thompson is writing to you from Gladstone,

4    Oregon about this matter?

5          MR. WILLNER:  Object to the form of the

6    question.  Leading.

7    A.    Yes.

8    Q.    (By Mr. Bonin)  You were asked about the rape quite

9    in depth by Mr. Willner.  Why don't you tell me in depth

10   about the damage and injury that the employees at Olympic

11   Panel did?

12         MR. WILLNER:  Object to the form of the

13   question.  Not covered in the direct examination.

14   Q.    (By Mr. Bonin)  Go ahead.

15   A.    They made things worse.  It was the same thing

16   happening over and over it felt like.  It was like a

17   reoccurring nightmare every day at work.

18   Q.    What kinds of things were happening?

19   A.    I was -- I had rumors spread about me about sexual

20   escapades I had had with people there, comments, certain

21   gestures made towards me, touching, stalking pretty much,

22   the center of attention always.

23   Q.    Prior to the rape, had you been the focus of that

24   attention?

25   A.    No.

FILE COPY

Exhibit A
Page 14 of 28
Bonin & Cook, P.S.

69

1    Q.    What's wrong with that?

2    A.    I had talked to him twice and Larry Brown once and

3    also Randy Ward.

4    Q.    What else does it say that's wrong?

5    A.    It says that I don't believe it is a timely grievance

6    and that they had been conducting a complete joint

7    investigation of all allegations.

8    Q.    Now wait a minute.  This is dated 6/5/07, right?

9    A.    Yes.

10   Q.    And you came to see him on 5/29/07, right?

11   A.    Yes.

12   Q.    When did you authorize a joint investigation with the

13   union?

14   A.    Never.

15   Q.    Did the union ever tell you that they were going to

16   embark upon an investigation before they filed the

17   grievance?

18   A.    Not until my meeting with Mr. Thompson.

19   Q.    In other grievances that have been submitted there is

20   always an article five or article something referenced up

21   here in contract -- contract article or practice violated.

22        MR. WILLNER:  I will object to the form of the

23   question; leading.

24        MR. BONIN:  Okay, do you want me to lay the

25   foundation, counsel?  It will get your discovery.  We can

FILE COPY

Exhibit _A_
Page _15_ of _28_
Bonin & Cook, P.S.

70

1  do that.

2          MR. WILLNER:  I made my objection.

3          MR. BONIN:  Why don't we take a brief break and

4  I will get some foundation for it.

5                          (Recess)

6  Q.   (By Mr. Bonin)  While I'm looking, Mrs. Olson, you

7  indicated that you didn't know who Mr. Simpson was

8  previously.  Did you see the reports or the handwritten

9  notations that Mr. Simpson made from local lodge 1042G

10  I believe?

11  A.   Yes, I've seen it.

12  Q.   Is there anything truthful in this?

13  A.   No.

14          MR. WILLNER:  If she is being referred to a

15  document, may I see a copy of it please?

16          MR. BONIN:  The local lodge 001042G.  You'll

17  find it in your packet of materials, counsel, at -- I

18  believe you referenced it in Exhibit 17.  It's the one

19  that's got your signature on the top of it.  If it's not

20  in there, it should be because that's how you produced it

21  to me.

22              Here it is.  It's about halfway in.

23          MR. WILLNER:  Give me just a second to find it

24  please.  It's about halfway in and it says Simpson on the

25  top?

FILE COPY

------------------------------------------

JANE JOHNSON, Court Reporter, Olympia, WA (360) 943-7698

Exhibit _____
Page ___ of ___
Bonin & Cook, P.S.

71

1          I have a copy.  Thank you.

2    Q.   (By Mr. Bonin)  It starts off: Shop Stewards.  In the

3    process of conducting the investigation of Sarah Grinenko

4    harassment, discrimination, hostile work environment

5    grievance.  It doesn't say -- what's missing from this

6    statement right here?  In the process of investigating the

7    Sarah Grinenko harassment, discrimination, hostile -- what

8    else is missing?  What was the promise that -- what was

9    the grievance that they were supposed to be pursuing?

10         MR. WILLNER:  Object to the form of the

11   question, leading.

12   Q.   (By Mr. Bonin)  Go ahead.

13   A.   The denial of union representation.

14   Q.   This appears to have the name Brett Simpson, S-S,

15   Page 1 of 2 on that.  Do you agree?

16   A.   Yes.

17   Q.   Can you go ahead and read what -- and it's got a

18   signature page on the second page, Brett Simpson, shop

19   steward?

20   A.   Yes.

21   Q.   By way of background, during the interview by

22   Mr. Thompson from Oregon, did Mr. Thompson ask you if

23   you knew who your shop steward was?

24   A.   I believe so.

25   Q.   What did you tell him?

FILE COPY

73

1   A.   Okay.  He asked me to give her my shop steward

2   orientation.

3   Q.   Did someone by the name of Brett Simpson give you a

4   shop steward orientation?

5   A.   Not that I can remember.

6   Q.   Did anyone give you any type of orientation from the

7   union?

8   A.   No, I just had one with Mel.

9   Q.   Okay, go to the next line and start with at that

10  time.

11  A.   At that time I expressed to her my position regarding

12  harassment/discrimination.

13  Q.   Did anyone around the first of the year from the

14  union express their position to you regarding

15  harassment/discrimination?

16  A.   No.

17  Q.   Next line.

18  A.   She said she understood.

19  Q.   Did you tell anyone from the union that you

20  understood their discussion with you about harassment and

21  discrimination?

22  A.   No.

23  Q.   The next line says what?

24  A.   That Mel came back into the room and gave her

25  basically the same speech again.

FILE COPY

------------------------------------------
JANE JOHNSON, Court Reporter, Olympia, WA (360) 943-7698

Exhibit _____
Page _18_ of _28_
Bonin & Cook, P.S.

75

1  was afraid that there would be a problem.

2  Q.    First, is Frank Daubert your supervisor?

3  A.    No.

4  Q.    And did you have this conversation with Frank

5  Daubert?

6  A.    No.

7  Q.    Did you authorize Frank -- well, if you didn't have

8  the conversation, never mind.  Go on to the next.

9  A.    I told Frank: unless the parents do something wrong,

10  she's going to have to deal with it.

11  Q.    Go on.

12  A.    Frank said: she told me not to tell anybody, so

13  please don't talk to her about it.

14  Q.    Did you ever tell Frank Daubert not to tell anybody

15  anything?

16  A.    I never had a conversation with him to tell him that.

17  Q.    Let's go to the next section that says the first part

18  of May.

19  A.    The first part of May I heard that Sarah had said she

20  was quitting on June 1st.

21  Q.    Okay, go on.

22  A.    Then on May 18th I heard that Sarah had quit.  She

23  just walked off the job.  I asked why she would do that.

24  They replied --

25  Q.    Okay, did you have a conversation with Brett Simpson

FILE COPY

------------------------------------------

76

1    or anyone else -- well, scratch that.

2                    You don't know who he heard this from,

3    right?

4    A.    No.

5    Q.    Now let's go to the next page.

6                    That would be LL001043G, counsel, on what

7    you did produce to me in discovery versus that document

8    there.

9                    Second page?

10   A.    I believe that says on May 1st -- does that say

11   first?

12   Q.    Well, that's interesting.

13                   I'm going to run a copy of this and have

14   it marked, but I'm going to show you what was produced on

15   LL1043G and I'm going to show you what's produced today in

16   discovery.  Why don't you tell me what's different.

17   A.    Their dates are different.

18   Q.    What does it say on LL001043G?

19   A.    That on May 21st.

20   Q.    Okay, and then on the one that has been produced to

21   us today, what does it say?

22   A.    May 1st.

23            MR. BONIN:  Counsel, I'm going to have all of

24   you turn to that page and confirm.  I want to circulate

25   this and then I'm going to make a photocopy.

FILE COPY

----------------------------------------
JANE JOHNSON, Court Reporter, Olympia, WA (360) 943-7698

Exhibit _A_
Page _20_ of _28_
Bonin & Cook, P.S.

77

1    Has everyone had an opportunity to read

2    it?

3    MR. HANBEY:  I don't intend to read what you're

4    going to have entered into the record.

5    MR. BONIN:  I'll get a photocopy.

6    MR. HANBEY:  Could we take just a short break?

7    I'm not sure how much longer you intend to go on, but I

8    need to contact my office before 5:00 o'clock.

9    MR. BONIN:  Please go ahead.

10    (Recess)

11   Q.   (By Mr. Bonin)  When we left off, I was going to

12   have -- I was running photocopies.  There was a request

13   for a break but I want to make sure.

14    Would you identify these two documents for

15   me please?  In terms of what has been -- and I didn't

16   provide the second Bate stamp page, but is this the second

17   page of LL1043G?

18   A.   Yes.

19   Q.   Let's verify that that's the second page of -- excuse

20   me, it's LLO -- take a look here please and read what this

21   number is.

22   A.   LL001042G.

23   Q.   42G?

24   A.   Uh-huh.

25   Q.   And then we have Page 1 which has Brett Simpson's

FILE COPY

----------------------------------------

78

1 | signature?

2 | A.    Yes.

3 | Q.    Brett Simpson is Page 1 of 2.

4 | A.    Yes.

5 | Q.    If we turn to the second page and then this says --

6 | A.    LL001043G.

7 |         MR. BONIN:  Okay, I don't know why that this --

8 | my photocopier grabbed it incorrectly but that is not

9 | there, but I circulated it and I had everyone identify

10 | that this page, which is identified as LL10 -- LL001043G

11 | is different from the materials produced in Exhibit 17.

12 |                 Off the record for a minute.

13 |                     (Remark off the record)

14 |         MR. BONIN:  Back on please.

15 | Q.    (By Mr. Bonin)  Would you please verify that number

16 | on the bottom right-hand corner?

17 | A.    LL001043G.

18 | Q.    On this page, other than that one modification, are

19 | there any other differences that you can see?

20 | A.    The date on the top, May 21st and May 1st.

21 | Q.    Other than that, does this appear to be the same

22 | document?

23 | A.    Yes.

24 |         MR. BONIN:  I would like to have these marked

25 | please.




FILE COPY

----------------------------------------
JANE JOHNSON, Court Reporter, Olympia, WA (360) 943-7698

Exhibit
Page 22 of 25
Bonin & Cook, P.S.

79

1                           (Exhibit Nos. 23 & 24 marked)

2   Q.    (By Mr. Bonin)  I would like you to take a look at

3   what purports to be your grievance and a copy of what's

4   been Bates stamped LL001229G.  Do you see any differences

5   in terms of what's filled out and what is not filled out?

6   A.    The job description on top is missing.

7   Q.    In yours or in --

8   A.    In mine.

9   Q.    Okay, so let's -- well, we don't want to use names

10  but would you agree that that name appears to be a male's

11  name?

12            MR. WILLNER:  Object to the form of the

13  question.  Leading.

14  Q.    (By Mr. Bonin)  Go ahead.

15  A.    Yes.

16  Q.    And your name is of course a female name?

17  A.    Yes.

18  Q.    So let's refer to LL001229G as male and LL001131G as

19  female.  Go ahead and tell me about what's filled out in

20  male that's left blank in female.

21  A.    The contract article or practice violated in the

22  male's is filled out.  Mine is not.

23  Q.    Does the signature of the steward appear to be the

24  same person?

25  A.    Yes.

FILE COPY

----------------------------------------

Exhibit  A
Page  23 of 29
Ronin & Cook, P.S.

80

1  Q.    Whose signature would that be?

2  A.    Mr. Dobson's.

3  Q.    In terms of either May 1st -- going back to what we

4  have marked as exhibits, the one produced in discovery

5  versus the one that has been identified as Exhibit 17

6  today, either on May 1st or May 21st, what's wrong with

7  this statement?  Just take the date out of it.

8  A.    Besides the date?

9  Q.    Yes.

10  A.    He never met with me around the first of the year.

11  Q.    He being who?

12  A.    Brett Simpson.

13  Q.    Looking at the date May 21st or May space one,

14  depending on which one we're going to be looking at, if we

15  turn to LL001136G there is apparently some type of an

16  entry for Yvonne Tahja, office secretary.  Do you see the

17  date up here?

18  A.    Yes.

19  Q.    What does that say?

20  A.    May 29th, 2007.

21  Q.    What does it say that's highlighted here?

22  A.    Shortly after she left, Brett Simpson came in.

23  Q.    But neither May space one nor May 21.  It doesn't say

24  May 29th.  Does it?

25  A.    No.

FILE COPY

--------------------------------------------

81

1              MR. WILLNER:   Object to the form of the

2     question.   Leading.

3     Q.   (By Mr. Bonin)   Had you gone to the union hall before

4     May 29th to ask for their help?

5     A.   No.

6     Q.   Did you know to go to the union hall before May 29th

7     to ask for their help?

8     A.   No.

9     Q.   You were asked if you ever participated in a union

10    meeting.   Did you know of any union meetings?

11    A.   When I was employed there?

12    Q.   Yes.

13    A.   I was told that they had elections for

14    representatives.

15    Q.   Did you ever see any election notification?

16    A.   Not that I can remember.

17    Q.   Did you ever know who was running for office?

18    A.   No.

19    Q.   Were you ever offered an opportunity to vote?

20    A.   No.

21    Q.   In the packet of information that you received --

22    did Eric Dobson, when he called you back in after having

23    sent you away, do you feel that he was treating you --

24    how was he treating you?

25    A.   Differently.

FILE COPY

82

1    Q.    When you learned, as has been confirmed by

2    Mr. Thompson who is sitting here today, that the union

3    does not have a claim for denial of union representation

4    unless you ask for it, how did you feel?

5    A.    That I was lied to.

6    Q.    I would like you to take a look at OPP --

7                    Who lied to you by the way?

8    A.    Mr. Dobson.

9    Q.    I would like you to take a look at OPP 000289 and I

10   would like you to read what has been produced to us by

11   Olympic Panel.

12           MR. WILLNER:  May I see the document that's in

13   front of the witness?

14   Q.    (By Mr. Bonin)  I would like you to read from here

15   down please. Out loud.

16   A.    I know quality is important.  When I was on days,

17   Eric Dobson was my trainer.  He told me I didn't have to

18   report all of my errors -- I don't know what that word

19   says -- that makes us look bad to the company.

20   Q.    Okay, this is a document.  What's the date on that?

21   A.    July 28th, '06.

22   Q.    Eric Dobson would be union president at that time,

23   wouldn't he?

24           MR. BONIN:  Object to the form of the question.

25   Leading the witness.

FILE COPY

-----------------------------------------

Exhibit  A
Page  26 of 28
Ronin & Cook, P.S.

99

1                        C E R T I F I C A T E

2

3    STATE OF WASHINGTON   )

4    County of Thurston    )

5

6         I, MARY JANE JOHNSON, a duly authorized Notary

7    Public in and for the state of Washington, do hereby

8    certify that the foregoing deposition of SARAH OLSON was

9    taken before me and completed on APRIL 1, 2008 and

10   thereafter transcribed under my direction;

11        That the deposition is a full, true and complete

12   transcript of the testimony of said witness;

13        That the witness, before examination, was by me

14   duly sworn to testify the truth, the whole truth and

15   nothing but the truth;

16        That I am herewith securely sealing said

17   deposition for delivery to counsel.

18        IN WITNESS WHEREOF, I have hereunto set my hand

19   and affixed my official seal this _8th__ day of April,

20   2008.

21

22

23                      /S/
                    _____
24                  Notary Public in and for the
                    state of Washington, residing
25                  at Olympia

FILE COPY

------------------------------------------
JANE JOHNSON, Court Reporter, Olympia, WA (360) 943-7698

Then on May 21, I stopped at The Union Hall
and Eric Dobson told me Sarah just Left.
she told him that she wanted to make a par
nplaint about sexual harrassment but Did
now how, I told him at that time that
had met with her around the 1st of the Yea
and told her how to deal with problems
the workplace;

Exhibit _A_
Page _27_ of _28_
Bonin & Cook, P.S.

BRITT Simpson
Shop Steward

OLSON
EXHIBIT
#23
4-1-08

FILE COPY

LL001043G

...when... ...Eric...appeared...in...front...at...Hall
and Eric Dobson told me Sarah just Left.
He told him that she wanted to make a
complaint about sexual harrassment but Did...
know how, I told him at that time that I
had met with her around the 1st of the Year
and told her how to deal with problems...
the workplace,

BRiTT Simpson
Shop Steward

Exhibit _A_
Page 28 of 28
Irwin & Cook, P.S.

OLSON

EXHIBIT
E24
4-1-08

FILE COPY

then on May 29 I stopped at the Union Hall and Eric Dobson told me Sarah just Left. She told him that she wanted to make a complaint about sexual harrassment but Didn't Know how. I told him at that time that I had met with her around the 1st of the Year and told her how to deal with problems in the workplace.

BRETT SIMPSON
Shop Steward

Exhibit _B_
Page _1_ of _1_
Bonin & Cook, P.S.

245 Fed.Appx. 588, 2007 WL 2088884 (C.A.9 (Cal.))
Briefs and Other Related Documents
Oral Argument Transcripts with Streaming Media

Exhibit _____C_____
Page ___1___ of __1__
Bonin & Cook, P.S.

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Ninth Circuit Rule 36-3. (Find CTA9 Rule 36-3)

United States Court of Appeals,
Ninth Circuit.
ST. PAUL FIRE & MARINE INSURANCE COMPANY and United States Fidelity and Guaranty Company, Plaintiffs-Appellees,
v.
VEDATECH INTERNATIONAL, INC., et al., Defendants-Appellants.
St. Paul Fire & Marine Insurance Company and United States Fidelity and Guaranty Company, Plaintiffs-Appellees,
v.
Vedatech International, Inc., et al, Defendants-Appellants.
Vedatech Inc., Vedatech K.K., and Mani Subramanian, Plaintiffs-Appellants,
v.
St. Paul Fire and Marine Insurance Company, United States Fidelity and Guarantee Company, Qad Inc., Qad Japan K.K., and Randall Wulff, Defendants-Appellees.
Nos. 05-16255, 05-16261, 05-16405.
Argued and Submitted May 16, 2007.
Filed July 19, 2007.
Background: Consolidated actions arising out of contractual and tort disputes were brought in state court. Following two removals, the United States District Court for the Northern District of California, Vaughn R. Walker, District Judge, 2005 WL 1513130, remanded the actions, ordered attorney fees for improper removal, and ordered sanctions. Removing parties appealed.

Holdings: The Court of Appeals held that:
(1) remand based on lack of federal question jurisdiction was immune from review on appeal;
(2) District Court was within its discretion in ordering attorney fees for improper removal;
(3) imposition of Rule 11 sanctions for second notice of removal was warranted;
(4) stay was warranted under the Colorado River abstention doctrine;
(5) removing parties failed to make out counterclaims for fraud and negligent misrepresentation;
(6) District Court was within its discretion in imposing sanctions against removing parties for unreasonably and vexatiously multiplying the proceedings; and
(7) recusal of trial judge was not warranted.

Affirmed.

West Headnotes

[1] ☑ KeyCite Citing References for this Headnote

☞ 334 Removal of Cases
  ☞ 334VII Remand or Dismissal of Case